1  PAUL B. SNYDER
   United States Bankruptcy Judge
2  1717 Pacific Ave, Suite 2209
   Tacoma, WA 98402
3

4
                                        _✓_FILED
                                        ____LODGED
                                        ____RECEIVED
5
                                        **March 16, 2009**
6                                    MARK L. HATCHER
                                 CLERK U.S. BANKRUPTCY COURT
                                 WESTERN DISTRICT OF WASHINGTON
7                                        AT TACOMA
                                 _____DEPUTY

8          **UNITED STATES BANKRUPTCY COURT**
           **WESTERN DISTRICT OF WASHINGTON AT TACOMA**

9  In re:                              Case No. 08-45328

10 PACIFIC LIFESTYLE HOMES, INC.,      **MEMORANDUM DECISION**

11                  Debtor.            **NOT FOR PUBLICATION**

12

13          THIS MATTER came on for an evidentiary hearing on February 17, 18 and 20, 2009, on Pacific

14 Lifestyle Homes, Inc.'s (Debtor) Motions Seeking Entry of An Order Under Sections 361 and 363[1] of

15 the Bankruptcy Code, Authorizing Debtor's Use of Cash Collateral and Granting Adequate Protection

16 for Bank of America, N.A. (BofA) and KeyBank, National Association (KeyBank) (collectively the

17 Lenders and Motions).[2]  Both Lenders filed an objection to the Debtor's Motions, as did the Official

18 Committee of Unsecured Creditors (Committee).  At the conclusion of the hearing, the Court took the

19 matter under advisement.  At the parties' request, post-hearing briefs were filed on March 5, 2009, to

20 provide additional legal authority on cash collateral.   This Memorandum Decision shall constitute

21 Findings of Fact and Conclusions of Law as required by Fed. R. Bankr. P. 7052.  This is a core

22 proceeding under 28 U.S.C. § 157(b)(2).  Based on the pleadings, testimony, and evidence presented,

23 the Court's findings of fact and conclusions of law are as follows.

24 _____

25 [1]Unless otherwise indicated, all "Code," Chapter and Section references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended by BAPCPA, Pub. L. 109-8, 119 Stat. 23, as this case was filed after October 17, 2005, the effective date of most BAPCPA provisions.
   [2] The Debtor also sought use of West Coast Bank's cash collateral, but prior to the hearing, the Debtor and West Coast Bank reached a contingent agreement.

MEMORANDUM DECISION - 1

# I

## FINDINGS OF FACT

There was conflicting information regarding some of the basic facts of this case among the pleadings, testimony, and hearing exhibits. The Court's Findings attempt to reconcile these conflicts.

On October 16, 2008 (Petition Date), the Debtor filed a voluntary petition for relief pursuant to Chapter 11. The Debtor continues to operate its business and manage its property as a debtor in possession.

The Debtor is a Washington corporation headquartered in Vancouver, Washington. One of the largest homebuilders in Southwestern Washington and Northern Oregon, the Debtor develops and sells real estate for residential purposes. The Debtor's core business is to acquire real estate, obtain the necessary government permits and approvals required for the property to be platted, either as a single family home or legal subdivision, construct the infrastructure, and construct the residential dwellings on each lot. The Debtor also constructs homes for owners on land owned by the owners. The Debtor offers design services to its customers to help customize their new homes. The Debtor has won numerous awards for its homes and design plans.

In years prior to 2008, the Debtor was constructing approximately 250-300 homes per year. The Debtor suspended the majority of its construction activities on its property in August, 2008, because its lenders stopped making advances under the Debtor's existing credit facilities. Testimony establishes that the Debtor is experiencing its current financial difficulties primarily because of the general financial and housing collapse. As of the Petition Date, the Debtor had approximately 9 communities under construction.

## A.   Bank of America

Commencing in 2006, BofA made a series of loans (BofA Loans) to the Debtor and its former subsidiaries and affiliates evidenced by promissory notes and secured by deeds of trust (collectively the BofA Loan Documents) on real estate located in both Washington and Oregon. The BofA Loans

MEMORANDUM DECISION - 2

were made on the following projects currently held by the Debtor's bankruptcy estate[3]: Songbird, Osprey Pointe, Banner Properties (acreage properties that were not part of a specific development), and Cassini View.[4] The Debtor is seeking to use cash collateral as defined in § 363(a) (Cash Collateral) from all of these projects except Cassini View (BofA Projects).

As of the Petition Date, it appears the BofA Projects were comprised of 22 completed homes, three partially constructed homes and 34 finished lots.[5] BofA and the Debtor stipulated that as of October 16, 2008, the Debtor owed BofA $21,973,689.36 in principal and interest.[6] Debtor's Exhibit 1 establishes that as of January, 2009, the Debtor held a total of $4,300,665 in Net Cash Proceeds from BofA Projects. BofA's post-hearing brief indicates that there is Cash Collateral in the amount of $4,300,300.

    1.    <u>Songbird</u>

Songbird is a subdivision with a total of 39 lots, located in Vancouver, Clark County, Washington. BofA and the Debtor stipulated that as of February 12, 2009, there were 26 lots and three homes unsold (one home in closing, one partially completed, one model home). Debtor's Exhibit 9 provides a comparison of the values of the unsold lots as determined by Debtor's appraiser The Zell Company d/b/a Zell & Associates (Zell) and by BofA's appraiser PGP Valuation, Inc. (PGP):

|  | Debtor | BofA |
|---|---|---|
| Retail Lot Value | $100,000 | $110,000 |
| Bulk Lot Value | $ 67,307 | $ 85,000 |
| Liquidation Lot Value | $ 40,384 | $ 68,077 |

The Per Lot Adequate Protection Payment is listed as $57,000, which is 85% of the Debtor's bulk sale appraisal. This is a decrease from the amount of $82,000 originally proposed in the Motions.

---

[3] Not listed as estate property are projects that are owned by separate entities or that were transferred to a different entity or a "liquidating trust" prior to bankruptcy.
[4] Evidence was unclear as to the status of Cassini View.
[5] Finished lots, or just "lots," are lots ready for home building.
[6] This debt includes loans made on property not part of the estate.

MEMORANDUM DECISION - 3

The modeling prepared by Clyde A. Hamstreet & Associates, LLC, at Debtor's Exhibit 1, indicates that the Debtor proposes to start construction of one new house per month at Songbird for four months. With a four-month construction period, the Debtor shows a sale in June, two in September, and a final sale in December, 2009. The gross sales price for each home is projected to be between approximately $323,462 and $326,423. BofA's Exhibit 78 indicates that after the $57,000 release price is paid, the actual net for the estate is $809.00.

2. Osprey Pointe

Osprey Pointe is a subdivision with a total of 54 lots located in Ridgefield, Clark County, Washington. BofA and the Debtor stipulated that as of February 12, 2009, there were three lots unsold. Debtor's Exhibit 9 provides the following values determined by Zell and PGP:

|                        | Debtor   | BofA       |
|------------------------|----------|------------|
| Retail Lot Value       | $125,000 | $105,000   |
| Bulk Lot Value         | $ 75,000 | $ 95,000   |
| Liquidation Lot Value  | $ 75,000 | $ 95,000[7] |

The Per Lot Adequate Protection Payment is listed as $86,000.[8]

3. Banner Properties

Banner Properties consists of Garrette Custom Homes, which are spec homes built on acreage parcels. Testimony indicates that these are located in several areas, including Kalama, Washougal, Gresham, Battle Ground, and Bush Prairie, Washington. BofA and the Debtor stipulated that as of February 12, 2009, remaining unsold in Banner Properties were five lots, three completed homes, and two partially completed homes. Neither the Debtor nor BofA completed appraisals on these properties.

---

[7] Debtor's Exhibit 7, which is Zell's appraisal of Osprey Pointe, only indicates a liquidation value; there is no bulk value provided. BofA's Exhibit 75, which is BofA's appraisal of Osprey Pointe, only indicates a bulk value; there is no liquidation value provided.
[8] This amount appears to be a variance from the other Lender Project lot release amounts, which testimony establishes are 85% of the Debtor's bulk sale appraisal.

MEMORANDUM DECISION - 4

**B.** __KeyBank__

Commencing in 2006, KeyBank made a series of loans (KeyBank Loans) to the Debtor and its former subsidiaries and affiliates evidenced by promissory notes and secured by deeds of trust (collectively the KeyBank Loan Documents) on real estate located in both Washington and Oregon. The KeyBank Loans were made on the following projects: Meriwether-Discovery and Meriwether-Hillshire Manor, Morgan's Vineyard, Ponte Cino Homes and Ponte Cino Townhomes, and Taverner Ridge (KeyBank Projects). The Debtor is seeking to use Cash Collateral from the KeyBank Projects.

As of the Petition Date, the KeyBank Projects were comprised of approximately 35 completed homes, eight partially constructed homes and 124 finished lots. The Debtor and KeyBank stipulated that the outstanding principal amount under the KeyBank Loans as of the Petition Date was $18,950,800 (which includes debt that is secured by deeds of trust on property that is no longer owned by Debtor). Debtor's Exhibit 2 establishes that as of January, 2009, the Debtor held a total of $4,577,760 in Net Cash Proceeds from KeyBank Projects. The pleadings and testimony, however, indicate that KeyBank has approximately $3.6 million in Cash Collateral. For the sake of consistency, the amount of KeyBank's Cash Collateral will be referred to as approximately 4 million dollars.

1. Taverner Ridge

Taverner Ridge is a planned community that currently consists of 44 single-family residential lots, four unfinished homes, and approximately four completed homes located in Ridgefield, Clark County, Washington. The evidence establishes that this subdivision is substantially uncompleted. At the current rate of sales, it would take approximately three to four years to build out this project.

Debtor's Exhibit 9 provides a comparison of the values of the unsold lots as determined by Debtor's appraiser Zell and by KeyBank's appraiser PGP:

|  | Debtor | KeyBank |
|---|---|---|
| Retail Lot Value | $102,614 | $115,500 |
| Bulk Lot Value | $ 65,909 | $ 87,000 |
| Liquidation Lot Value | $ 39,545 | $ 70,125 |

MEMORANDUM DECISION - 5

The Per Lot Adequate Protection Payment is listed as $56,000, which is 85% of the Debtor's bulk sale appraisal. This is a decrease from the amount of $86,000 originally proposed in the Motions, which was based on an estimate bulk sale price rather than an actual appraisal. The Debtor has increased the average price per home by approximately $46,000 due to a proposed increase in square footage and additional options. KeyBank's Exhibit 12 indicates that the proposed unit proceeds available for payment on the KeyBank debt is $73,596.

Craig Zell, President of Zell, the Debtor's expert appraiser, testified that Clark County is in an over-supply situation. He testified that Taverner Ridge is a better, more desirable and higher demand project.

2.    Meriwether

This project consisting of two sections—Hillshire Manor and Discovery—is located in Woodland, Cowlitz County, Washington. The evidence establishes that this subdivision is substantially uncompleted. There are a total of 66 lots, seven completed homes, and a few homes under construction. At the current rate of sales, it would take approximately four to five years to build out this project.

Debtor's Exhibit 7 provides that "Woodland is suffering through what can only be described as a market collapse. According to RMLS Market Action, the Woodland area has seen a 31.6% decrease in pending sales and a 30.6% decrease in median price, year to date." Kent Mordy, financial advisor to BofA and KeyBank, believes there will be a decline in value at this subdivision. Since filing bankruptcy, the Debtor has reduced the house prices in this project by an average of 20%. Due to the outlying location of this project, Meriwether is in a more price-sensitive market.

a.    Hillshire Manor

Hillshire Manor consists of 11 single-family residential lots within a 45 lot recorded phase of a larger multi-phase subdivision. Debtor's Exhibit 9 provides a comparison of the values of the unsold lots as determined by Debtor's appraiser Zell and by KeyBank's appraiser PGP:

|              | Debtor    | KeyBank   |
| ------------ | --------- | --------- |
| Retail Lot Value | $ 60,000 | $ 75,000 |
| Bulk Lot Value | $ 49,200 | $ 60,909 |
| Liquidation Lot Value | $ 29,520 | $ 51,818 |

The Per Lot Adequate Protection Payment is listed as $42,000, which is 85% of the Debtor's bulk sale appraisal. This is a decrease from the amount of $56,000 originally proposed in the Motions. The Debtor has increased the average price per home from $230,000 to $268,000 due to a proposed increase in square footage and additional options. KeyBank's Exhibit 12 indicates that the proposed unit proceeds available for payment on the KeyBank debt is $51,392.

       b.    Discovery

Meriwether Discovery consists of 55 single-family building lots and two unfinished homes within a 68 lot recorded phase of a larger multi-phase subdivision. Debtor's Exhibit 9 provides a comparison of the values of the unsold lots as determined by Debtor's appraiser Zell and by KeyBank's appraiser PGP:

|              | Debtor    | KeyBank   |
| ------------ | --------- | --------- |
| Retail Lot Value | $ 60,000 | $ 75,000 |
| Bulk Lot Value | $ 40,363 | $ 53,455 |
| Liquidation Lot Value | $ 24,000 | $ 42,727 |

The Per Lot Adequate Protection Payment is listed as $34,000, which is 85% of the Debtor's bulk sale appraisal. Testimony establishes that the lot release value was reduced from $66,000. The Debtor has increased the average price per home by $57,000 due to a proposed increase in square footage and additional options. KeyBank's Exhibit 12 indicates that the proposed unit proceeds available for payment on the KeyBank debt is $37,662.

       3.    Banner Properties

This consists of one stand-alone home in Clark County, that is projected to be sold in April, 2009. The Debtor expects to receive $420,000 in net proceeds. The Debtor will turn this over to

MEMORANDUM DECISION - 7

KeyBank when this last Garrette Custom Homes home is completed.

    4.    <u>Morgan's Vineyard</u>

       Morgan's Vineyard is a subdivision that consists of approximately six lots and nine homes located in Lafayette, Yamhill County, Oregon, which is in the Portland metropolitan area.  Build out of the project is near the end.  Debtor's Exhibit 9 provides a comparison of the values of the unsold lots as determined by Debtor's appraiser Zell and by KeyBank's appraiser Moscato, Ofner & Henningsen, Inc. (M, O & H):

|                         | Debtor     | KeyBank    |
| ----------------------- | ---------- | ---------- |
| Retail Lot Value        | $ 75,000   | $ 95,000   |
| Bulk Lot Value          | $ 61,666   | $ 79,167   |
| Liquidation Lot Value   | $ 36,666   | $ 66,667   |

The Per Lot Adequate Protection Payment is listed as $52,000.  This is an increase from the amount of $42,000 originally proposed in the Motions.  KeyBank's Exhibit 12 indicates that the proposed unit proceeds available for payment on the KeyBank debt is $48,358.

    5.    <u>Ponte Cino</u>

       This project consists of single-family homes and townhomes located in Happy Valley, Clackamas County, Oregon.  There are approximately 10 lots[9], seven homes, and a few homes under construction.  This project is substantially more developed than the Woodland and Ridgefield projects (Meriwether and Taverner).

       Kevin Wann (Wann), President of the Debtor, testified that although the housing market has softened in all areas, the closer-in projects like Ponte Cino and Morgan's Vineyard have maintained their pricing level better than the Woodland and Ridgefield projects (Meriwether and Taverner).  For

---

[9] The Court recognizes that this total number of lots is inconsistent with the number of lots specified under the homes and townhomes sections.  This discrepancy is due to the inconsistency among the pleadings, testimony, and exhibits.

MEMORANDUM DECISION - 8

the outlying projects, a lower price point is a more important factor for buyers due to a longer commute.

### a. Homes

Ponte Cino Homes consists of approximately one single-family residential lot.  Debtor's Exhibit 9 provides a comparison of the values of the unsold lots as determined by Debtor's appraiser Zell and by KeyBank's appraiser M, O & H:

|  | Debtor | KeyBank |
|---|---|---|
| Retail Lot Value | $120,000 | $ 90,000 |
| Bulk Lot Value | $100,000 | $ 73,000 |
| Liquidation Lot Value | $ 60,000 | $ 62,800 |

The Per Lot Adequate Protection Payment is listed as $85,000.  This is an increase from the amount of $76,000 originally proposed in the Motions.  KeyBank's Exhibit 12 indicates that the proposed unit proceeds available for payment on the KeyBank debt is $102,210.

### b. Townhomes

Ponte Cino Townhomes consist of approximately six lots for attached units.  Debtor's Exhibit 9 provides a comparison of the values of the unsold lots as determined by Debtor's appraiser Zell and by KeyBank's appraiser M, O & H:

|  | Debtor | KeyBank |
|---|---|---|
| Retail Lot Value | $ 90,000 | $ 60,000 |
| Bulk Lot Value | $ 73,333 | $ 48,600 |
| Liquidation Lot Value | $ 45,000 | $ 41,800 |

The Per Lot Adequate Protection Payment is listed as $62,000.  This is a decrease from the amount of $76,000 originally proposed in the Motions.  KeyBank's Exhibit 12 indicates that the proposed unit proceeds available for payment on the KeyBank debt is $7,396.

MEMORANDUM DECISION - 9

**C.**     **The Debtor**

The Debtor is a volume home builder, which builds track homes in a period of approximately 90 days from start to finish. The Debtor has long-term relationships with its subcontractors. Additionally, it employs specialists, which include people in sales, builders, warranty personnel for servicing customers, administrative employees for handling financing and closing, and accounting staff. The Debtor has reduced its employees from 115 to 24. Wann testified that he has trimmed his staff as far as possible. He testified that in order to support the Debtor's overhead, he needs use of the Cash Collateral from both Lenders and West Coast Bank. Wann testified that the Debtor needs $5.7 million to continue in business as is.

**D.**     **Market and Sales Projections**

Gerald Johnson (Johnson), the Debtor's real estate and economic expert, testified that demand for houses is down by one-third. He testified that it is difficult to forecast the housing market. He compared today's economic situation to a 100-year flood. He testified that generally, areas are looking at a decline of 7-10% in 2009, although a leveling off should occur in 2010.

Johnson testified that people prefer a more developed community to one with more unfinished lots and less completed homes. Wann testified that building in a project near completion is less risky than building in a project not as complete.

**E.**     **Cash Collateral**

Clyde Hamstreet (Hamstreet), President of Clyde A. Hamstreet & Associates, LLC, has been working with the Debtor since 2008 on the proposed cash collateral plan. He testified that selling vacant lots would yield the least amount of money to the Lenders. He testified that the collateral value in the hands of the Debtor is higher than in the hands of the Lenders. Because payments are made to the Lender when homes are sold, loan balances decrease as inventory decreases.

The cash collateral plan proposes a lot release price in excess of the liquidation price of the lots. He stated in his declaration, however, that "[h]ome prices have fallen so dramatically that it is

MEMORANDUM DECISION - 10

impossible for Debtor to sell its existing inventory of homes at prices sufficient to pay the historical lot release prices and have cash left over to stay in business."

Hamstreet testified that in normal times, builders expect a profit of 17-22%. Today, 10% is a reasonable margin. Spring is the time to start building as it is when people buy homes. The Debtor proposes to use Cash Collateral through December, 2009, which will be all of the Debtor's working capital except for a loan from Wann for $1.7 million.

Wann testified that under conventional financing outside of bankruptcy, the risk of decreased sales or sale prices is on the builder, or Debtor. But under the current cash collateral model, an error in projections of house values still permits the Debtor to receive 10% off the top and payment of the professionals in the case.

**F.    Kevin Wann**

Wann personally guaranteed a number of the Debtor's obligations, including two million dollars unsecured personal guaranty to KeyBank and one million dollars unsecured personal guaranty to BofA. On December 9, 2008, the Court approved a stipulated order authorizing the estate to obtain post-petition financing pursuant to § 364 from Kevin and Nicki Wann. The Wanns committed $1.7 million of their personal funds from a tax refund in order to cover current and future operating costs of the estate. As of the hearing date, the Debtor had borrowed approximately $500,000 of this amount.

Wann testified that he intends to commit his 2008 tax refund, estimated to be around four million dollars, in order to fund confirmation of a Plan of Reorganization (Plan). He is unwilling to do so, however, unless he believes the Debtor will be able to confirm a Plan. Wann expects to receive the tax refund between September and October, 2009. Wann currently receives an income of approximately $26,000 per month from the Debtor, which was his salary prepetition.

**G.    Procedural History**

Shortly after filing bankruptcy, the Debtor moved for limited use of Cash Collateral as to KeyBank and West Coast Bank for purposes of weatherizing several houses in various states of construction to prevent damage. On December 9, 2008, the Court approved two stipulated orders

MEMORANDUM DECISION - 11

authorizing limited use of Cash Collateral and granting adequate protection for KeyBank and West Coast Bank.

On December 30, 2008, the Debtor filed the Motions, seeking use of BofA's and KeyBank's Cash Collateral in the ordinary course of business consistent with the Budgets for each BofA Project and KeyBank Project (Lender Projects) set forth in Exhibit A to each respective Motion. In support thereof, the Debtor filed the declarations of Wann and Hamstreet. According to the Debtor's December 2008 Monthly Financial Report, the Debtor reported a net loss of $1,377,571 for the post-petition period from October 17, 2008, to December 31, 2008.

For each Lender, the Debtor needs use of the Cash Collateral primarily to: (1) complete construction of the partially constructed homes; (2) build new homes; (3) pay expenses related to the Lender Projects, including payment of assessments owed to homeowner associations, insurance premiums, accrued and accruing ad valorem property taxes, fulfillment of government conditions under existing permits, and marketing and advertising costs; and (4) contribute to Debtor's general and administrative expense of its business and this Chapter 11 case.

For each Lender, the Debtor proposes to use the Cash Collateral in the following manner:

(1)     Ten percent of all gross proceeds from sales of homes in each Lender Project and ten percent of the existing balance in the Segregated DIP Accounts determined at the time an order approving the Motions are entered, will be retained by the Debtor for working capital and other general corporate expenses. These funds will be used for general corporate purposes before applying the funds from the DIP Financing.

(2)     Except as specifically provided, the Debtor will use the Net Cash Proceeds from home sales to fund expenses incurred after January 1, 2009, that are necessary to preserve each Lender Project. These costs include costs to complete construction and to commence new construction, costs to market and sell completed homes, including the costs of providing home warranties, and costs to maintain the existing homes.

MEMORANDUM DECISION - 12

The Lenders will not receive payment of any profits earned on the individual homes within a Lender Project until that Lender Project is completed.

Pursuant to § 363(e), the Debtor proposes to make adequate protection payments to the Lenders for use of their Cash Collateral, equal to the interest payment on their debts.

## II

## CONCLUSIONS OF LAW

The Debtor argues that to fully implement its business plan, three factors must be met: (1) achieve a level of sales that will support its general overhead requirements and provide sufficient funding to restart construction activities; (2) replenish its inventory of completed homes in order to maintain its operations on a going forward basis; (3) obtain the use of Cash Collateral from both Lenders <u>and</u> West Coast Bank in order to fund ongoing operations and building expenses. The Debtor and West Coast Bank have entered into a contingent agreement allowing the Debtor use of West Coast Bank's Cash Collateral, but BofA and KeyBank oppose the use of their Cash Collateral.

Under § 363(c)(2), a debtor may not use cash collateral unless consented to by the entity that has an interest in the cash collateral or with court authorization. Section 363(e) provides that on request of an entity that has an interest in property to be used by the debtor, the court shall prohibit or condition the use "as is necessary to provide adequate protection of such interest." The debtor has the burden of proof on the issue of adequate protection. § 363(p)(1).

The Code does not define adequate protection but sets forth three alternative non-exclusive methods by which adequate protection may be provided when required under § 363: (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest in such property. § 361. The determination of adequate protection is a question of fact for the trial court. <u>In re Bear River Orchards</u>, 56 B.R. 976, 979 (Bankr. E.D. Calif. 1986).

Courts have recognized the breadth of adequate protection. "'The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11

MEMORANDUM DECISION - 13

reorganization.'" In re Mosello, 195 B.R. 277, 288 (Bankr. S.D. N.Y. 1996) (quoting In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992)).  "The concept of adequate protection was designed to 'insure that the secured creditor receives the value for which he bargained.'" In re Martin, 761 F.2d 472, 474 (8th Cir. 1985) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S. Code Cong. & Ad.News 5787, 5839 (emphasis added)).  "Secured creditors should not be deprived of the benefit of their bargain."  In re Am. Mariner Indus., Inc., 734 F.2d 426, 431 (9th Cir. 1984), effectively overruled on other grounds by United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 368 (1988).  As the Ninth Circuit Court of Appeals set forth from the House Report,

> There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest.  Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

American Mariner, 734 F.2d at 431 (quoting H.R. Rep. No. 595 at 339, 1978 U.S. Code Cong. & Ad.News at 6295).

 "Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value." American Mariner, 734 F.2d at 432.  While sections 361(1) and (2) by their own terms compensate for a decrease in value, the "compensatory nature of adequate protection is even more apparent from the catch-all alternative of section 361(3)." American Mariner, 734 F.2d at 432.

The phrase "indubitable equivalent" as used in § 361(3) was coined by Judge Learned Hand in In re Murel Holding Corp., 75 F.2d 941, 942 (2nd Cir. 1935), as follows:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now.  Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property.  We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

MEMORANDUM DECISION - 14

"'Indubitable' means 'too evident to be doubted.'" In re Arnold & Baker Farms, 85 F.3d 1415, 1421 (9th Cir. 1996) (quoting In re Arnold & Baker Farms, 177 B.R. 648, 661-62 (9th Cir. BAP 1994) (citation omitted)). "[T]o the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." In re Keller, 157 B.R. 680, 683-84 (Bankr. E.D. Wash. 1993).

The use of indubitable equivalent "at least encourages if not requires a present value analysis under section 361," so that the present value of the secured creditor's interest is protected. American Mariner, 734 F.2d at 432. As explained by the Ninth Circuit Court of Appeals,

> In its context, Judge Hand's interpretation of adequate protection emphasizes two factors. First, it suggests that to be "completely compensatory" adequate protection must compensate for present value, "that payment ten years hence is not generally the equivalent of payment now." . . . Second, adequate protection must insure the safety of the principal. . . . Judge Hand concluded that the creditor's right "to get his money or at least the property" may be denied under a plan for reorganization only if the debtor provides "a substitute of the most indubitable equivalence." Such a substitute clearly must both compensate for present value and insure the safety of the principal.

American Mariner, 734 F.2d at 433.

The Debtor contends that the Lenders are adequately protected because use of the Lenders' Cash Collateral will increase the value of the Lender Projects, rather than decrease the value. It contends that if the Lender Projects are not completed, given the current market conditions, their values will decline significantly. Even so, the Debtor proposes to make adequate protection payments as follows: (1) monthly payments equal to the non-default interest under the applicable note, made from the Lenders' Cash Collateral; and (2) lot release amounts determined by the Debtor for each Lender Project. As further adequate protection, the Debtor also proposes to each Lender (1) a replacement lien on the Net Cash Proceeds from future sales; (2) a lien on all improvements made to existing and new homes; (3) limiting use of Cash Collateral as determined by the Court; (4) limiting construction of spec homes based on the current inventory of spec homes for each Lender Project, as determined by the Debtor; (5) limiting construction of new homes based on the balance of the

Segregated DIP Accounts; (6) regular reporting to the Lenders and Committee; (7) maintaining insurance; and (8) reasonably managing home construction.

In assessing the Debtor's request for the use of Cash Collateral, like other courts examining cash collateral, this Court is mindful of the purposes of a business reorganization under Chapter 11: "[T]o initially relieve the debtor of its prepetition debts, to free cash flow to meet current operating expenses, and ultimately to permit the debtor 'to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.'" American Mariner, 734 F.2d at 431 (quoting H.R. Rep. No. 595 at 220, 1978 U.S. Code Cong. & Ad.News at 6179). The Court's concern for these purposes is particularly pronounced given today's economic situation and the federal government's goal to stimulate the economy through job growth, a housing bailout, and other financial measures.

In evaluating adequate protection in the context of a cash collateral request, the Eight Circuit Court of Appeals applied a three-step approach to determine whether the proposed adequate protection provided the creditor with the value of his bargained for rights.

> In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard. This flexibility, however, must not operate to the detriment of the secured creditor's interest. In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

In re Martin, 761 F.2d at 476-77 (citation omitted).

In this case, the value at issue is the present value of the use of the Net Cash Proceeds which comprises the Cash Collateral for the Lenders. The evidence establishes that as of the pending Motions, the Debtor held approximately $4.3 million in Cash Collateral for BofA, and approximately four million dollars for KeyBank. Thus, the Debtor must "as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights," American Mariner, 724 F.2d at 435, which is the present use of cash totaling approximately eight million dollars.

MEMORANDUM DECISION - 16

The Lenders argue that the "adequate protection" offered by the Debtor is not adequate to protect them from erosion in the value of their collateral. First, although the Debtor promises to pay interest at the contract non-default rate, it would pay the interest amount from the sales proceeds it is already withholding from the Lenders and in which the Lenders already have a secured interest. Second, while the Debtor promises a replacement lien on the proceeds of future sales or improvements of new homes constructed, the Lenders' deeds of trust already extend to the sale proceeds of its collateral and improvements on the real estates securing its deeds of trust.

The Court primarily agrees with the Lenders' position. The Debtor has pointed to no possible additional source from which it could make cash payments, other than from the sales proceeds upon which the Lenders already hold first liens. Nor has the Debtor offered other unencumbered property that could be used to provide "an additional or replacement lien" to the Lenders. In <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 565-67 (3rd Cir. 1994), the Third Circuit Court of Appeals rejected as adequate protection similar offers—continued personal guarantees and liens on sales proceeds— where the creditor in that case was entitled to these offers anyway. Furthermore, this Court concludes that as to the lot release payments, these cannot be "periodic cash payments" under § 361(2) because the Lenders will receive these if and only if a house sells. These are not recurring payments proposed to be made at fixed intervals, as <u>Black's</u> defines "periodic." <u>Black's Law Dictionary</u> 1138 (6th ed. 1990). Thus, subsections (1) and (2) of § 361 are not a basis for adequate protection in this case. <u>See</u> <u>Mosello</u>, 195 B.R. at 288 (where court analyzed adequate protection under the "indubitable equivalent" standard when debtor had no separate source from which to make periodic cash payments and no unencumbered property to provide an additional or replacement lien).

The question then is whether the Debtor can offer additional adequate protection that is the indubitable equivalent of the value of the present use of the Lenders' Cash Collateral. The primary adequate protection offered by the Debtor is the increase in value of the Lenders' collateral (distinct and different from Cash Collateral) that is projected to occur with continued construction of the Lender Projects. In order to answer this question, the Court must determine whether the proposed continued

MEMORANDUM DECISION - 17

construction compensates the Lenders for the present value of their Cash Collateral, and whether the proposed continued construction protects the safety of their Cash Collateral.

Central to the Debtor's argument is that allowing its business to continue will result in an increase in value to the Lender Projects greater than would be realized if the Debtor ceased operating. The Lenders disagree, however, contending that there is no guarantee of success and that under this proposal they will assume the risk of future nonprofitability at the expense of approximately eight million dollars in cash available to them now.

In <u>Swedeland</u>, the appellate court considered whether the debtor in possession offered adequate protection to a pre-petition lender for purposes of obtaining credit pursuant to § 364(d)(1), and thereby creating a superpriority lien in the post-petition lender. <u>Swedeland</u>, 16 F.3d at 556-57. The debtor in that case was developing a 508-acre golf course and residential project. Among other incentives, the debtor offered the pre-petition lender as adequate protection increased value of the property due to the continued construction. The Third Circuit Court of Appeals thoroughly reviewed and rejected this contention:

> In the first place, continued construction based on projections and improvements to the property does not alone constitute adequate protection. <u>See Town of Wesport v. Inn at Longshore</u>, 32 B.R. 942, 946 (Bankr. D. Conn. 1983). Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements. <u>See, e.g.</u>, <u>In re O'Connor</u>, 808 F.2d at 1396 (grant of additional, unencumbered collateral); <u>In re 495 Central Park Avenue Corp.</u>, 136 B.R. 626 (Bankr. S.D. N.Y. 1992) (projected property improvements constituted adequate protection where annual rental income of $180,000 from an existing lease conditioned on improvements would increase value of real estate securing pre-petition loan by at least $800,000, and superpriority post-petition loan financing the projected improvements amounted to only $650,000). We reject the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable.

<u>Swedeland</u>, 16 F.3d at 566.

Similar to the debtor in <u>Swedeland</u>, the Debtor contends that if it is permitted to complete existing unfinished houses and build new houses, it can sell these houses and successfully continue its business. It urges that continued construction will result in the Lenders getting paid more than if

MEMORANDUM DECISION - 18

construction is halted. Yet a preponderance of the evidence establishes the rate of house sales is down sharply, house prices are continuing to decline, unemployment rates are rapidly rising, financing for home purchases is difficult, and foreclosure rates are climbing. There is speculation by the Debtor's experts as to when and to what degree the housing market will recover. Given the testimony of the Debtor's and Lenders' experts, however, the evidence establishes that use of historical data cannot accurately project future market conditions and real estate values due to the unparalleled economic crisis this country is experiencing. As Debtor's counsel stated at BofA's Exhibit 77, "The impact of the subprime mortgage crises and other financial crises on the real estate sector is unparalleled in recent history. It is impossible at this time to predict whether housing prices will continue to fall and for how long, let alone when they will start to level off and rebound."

Through its proposed adequate protection, the Debtor has offered little, if anything, of additional value to the Lenders in exchange for the use of their Cash Collateral. Instead, the Debtor relies on its hopes and projections of future profitability, and does so during a period of financial crisis unprecedented in recent history. The Court concludes that this speculation does not compensate the Lenders for the present value of the use of their Cash Collateral. Even though the Debtor historically ran a successful business and operated at a comfortable profit margin, today's market may no longer support this model. If the Debtor continues to conduct business as usual and construct homes across the board—in Lender Projects both close to and far from completion—there is no guaranty that the homes will sell, or will sell in a timely manner, sufficient to compensate the Lenders for the loss of approximately eight million dollars in cash that is available to them today.

Furthermore, the Debtor's proposal does not protect the safety of the Lender's Cash Collateral. The Debtor and Wann propose to assume little risk for the use of the Lenders' Cash Collateral. Notably, Wann testified that he will not unconditionally commit his four million dollar tax refund; rather, he will commit it only if he is certain the Debtor can reorganize. Furthermore, it is uncontested that when a house sells, the Debtor will receive the first 10% distribution for operating expenses, which includes payment to Wann of his salary at the prepetition rate of some $26,000 per

MEMORANDUM DECISION - 19

month; next the subcontractors will receive payments for their services on that particular house; and finally the Lenders will receive only the lot release amount. A preponderance of the credible evidence establishes that the lot release prices to be paid to the Lenders have and may continue to substantially decrease. Additionally, if any funds are received in excess of these amounts, these will be available to the Lenders only when the respective project is completed.

Should the Debtor's reorganization fail, Wann will be paid on his $1.7 million postpetition loan pursuant to § 364(a) prior to payment of the Lenders. The professionals employed in this case will be paid pursuant to a carve-out. Only then will the Lenders will receive their collateral, or value of their collateral. Their collateral, however, will include unsold houses. Thus, the Lenders could be left with the additional cost of maintaining the unsold houses until the housing market rebounds. These costs clearly exceed the costs of maintaining unimproved lots.

The Debtor has presented this Court, as well as BofA and KeyBank, with an "all or nothing" approach. It contends that it needs to use all of the Cash Collateral of both Lenders and West Coast Bank in order to reorganize. It makes these demands even though the objecting Lenders indicated at the hearing that they may be willing to negotiate with the Debtor regarding its use of Cash Collateral on a more limited scale.

The Court acknowledges that the evidence indicates that if the Debtor is unable to reorganize, the Lenders will be left with the finished lots, which testimony establishes is likely worth less than lots containing homes (assuming that these homes could be sold quickly for the asking price). It is also undisputed that currently there is virtually no market for bulk sale lots. Yet the Court must evaluate the value and security of the Lenders' Cash Collateral, which is approximately eight million dollars cash available to the Lenders today; that the homes may not sell, or sell for less than expected; and that the Lenders could be left with maintaining unsold homes, which is far more expensive than lots. There also can be no question that the Lenders are aware of the losses that will occur if they are forced to foreclose on the lots.

MEMORANDUM DECISION - 20

1    The Court and creditors, secured and unsecured, would like nothing more than for the Debtor

2    to succeed in a reorganization.  The Debtor has an excellent reputation, appears to be well managed,

3    and has provided a quality product.  A successful reorganization would not only maintain a historically

4    successful business, it would save numerous jobs during a tumultuous economic time.  The Debtor,

5    however, has not met its burden of proof in establishing that the proposed adequate protection for the

6    use of all of the Lenders' Cash Collateral adequately protects the Lenders' interest under the "all or

7    nothing" approach.

8        Accordingly, the Debtor's requests to use the Cash Collateral of BofA and KeyBank are denied.

9        DATED:        March 16, 2009

10                                    _____
                                      *Paul B. Snyder*

11                                    Paul B. Snyder
                                      U.S. Bankruptcy Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25


MEMORANDUM DECISION - 21